**STATE**

v.

**Allen M. BRASH et al.**

**No. 85–23–C.A.**

Supreme Court of Rhode Island.

July 28, 1986.

Arlene Violet, Atty. Gen., Annie Goldberg, Sp. Asst. Atty. Gen., for plaintiff.

Robert B. Mann, Richard A. Gonnella, Providence, for defendants.

## OPINION

SHEA, Justice.

The defendants, Allen M. Brash and Eugene S. Fountaine, were convicted after a trial by jury in the Superior Court of conspiracy to commit murder. They are now before this court appealing the judgments of conviction. Brash also appeals his conviction of possession of a firearm after previous conviction of a violent crime. We reverse and remand for a new trial.

Indictment No. 81–2312 contained four counts. Count 1 charged Robert Farrell,

Eugene Fountaine, Allen Brash, and William Salisbury with the April 12, 1981 murder of James Heaney in Scituate, Rhode Island. Count 2 charged them with conspiracy to commit the murder. Counts 3 and 4 charged Brash with commission of a crime of violence while armed and with possession of a firearm after previously being convicted of a crime of violence. Fountaine and Brash were acquitted of count 1, and Brash was acquitted of count 3. The facts of this case are as follows.

Early in 1981 the Federal Bureau of Investigation (FBI) was investigating a stolen-car ring operating in Rhode Island and Massachusetts. FBI Agent James Bubela had the group under surveillance and was tracking its activities. James P. Heaney was a participant in the car-theft operation. At some point in the investigation, Heaney began to provide information secretly to the government about the stolen-car operation in the expectation that he would receive leniency.

At about ten o'clock in the evening on April 12, 1981, Glen Shirley and his wife were driving along Shun Pike in Scituate, Rhode Island, when they encountered a burning car at the side of the road. The Scituate fire and police departments were summoned, and the fire-fighters extinguished the fire, which by then had fully engulfed the car. James Heaney's badly burned body was found in the driver's seat. An autopsy performed by Medical Examiner Arthur C. Burns revealed that Heaney had been shot in the head three times at close range, that the shots had killed him within a few minutes, and that he was already dead by the time the fire started.

The police were without suspects, and the murder remained unsolved until September 30, 1981, when William Salisbury approached FBI Agent Bubela with an offer to provide information about Heaney's murder in exchange for $1,000. Salisbury had robbed a drug dealer who reported the incident to the Pawtucket police, and a warrant for Salisbury's arrest for robbery was outstanding. He needed the money to

pay off the drug dealer, who then apparently would drop the charge. Salisbury was already on parole for another crime; and he was concerned that if the authorities learned of the robbery, he would be sent back to prison for violating his parole. Thus began a series of events that would place Salisbury at the center of an ever-widening circle of unsolved crimes. Salisbury met with Bubela three times and implicated Brash and Fountaine in the murder without admitting his own participation in it.

A few days after the third meeting at which he received the last installment of the $1,000, Salisbury was arrested on the robbery charge and held at the Adult Correctional Institutions. State Police Lieutenant Thomas Moffatt, who did not know about Salisbury's relationship with Bubela, approached Salisbury to discuss his involvement in another crime. At this time Salisbury offered to provide evidence and testimony about the Heaney murder and other crimes in exchange for a "deal." Subsequently, Salisbury's offer was accepted by the state on the condition that Salisbury had not actually done the shooting in the murder.

Salisbury is now in the Federal Witness Protection Program living in another state under another name. In exchange for his testimony, Salisbury was promised that he would not have to go to jail for his participation in the Heaney murder or for his participation in any other crime. Salisbury stated that "the deal was as long as I wasn't the shooter in any of these crimes, I would get a deal." The other crimes included a homicide in a state that has the death penalty, conspiracies to commit murder, five or six armed robberies, and about twenty-five other robberies. Salisbury was to provide information and testimony in these cases as well.

William Salisbury was the state's key witness in the two-week-long trial that is recorded in a 1,500-page transcript. His testimony at trial about the events occurring on April 12, 1981, follows.

Salisbury and Brash were having dinner with their girl friends when Brash received a phone call from Fountaine. He and Brash met Fountaine, who said that Robert "Beans" Farrell had offered them $5,000 to kill Heaney. According to Fountaine, Farrell would convince Heaney to drive a stolen car to a location near Plainfield Pike and Route 295 in Scituate. The area was sparsely populated and heavily wooded, and this was where Heaney's murder was to take place. Farrell wanted him killed because Heaney had become an informant and would implicate Farrell and a number of other people in the car-theft operation. Time was of the essence because Heaney, about to begin serving a prison sentence in Connecticut, would be more difficult to kill once in prison.

The three drove to the agreed-upon location and waited for Heaney. When they saw Heaney arrive in the stolen car, they blinked the lights and Heaney pulled over, at which time Salisbury approached him and asked if he was "ten speed." Heaney replied that he was "ten speed," and then Salisbury and Brash got into the car with Heaney. Fountaine, who was still in the other car, drove ahead and led them to Shun Pike. They then pulled over to the side of the road. Brash was sitting in the back seat behind Heaney when he shot him in the head several times with a .38-caliber pistol. Salisbury had a pistol, a .380-caliber llama, which was only to be used as a backup in the event Brash was unsuccessful. Salisbury absolutely denied having pulled the trigger of the gun that killed Heaney. They fled to Fountaine's car immediately after the shooting, leaving Heaney's body in the stolen car with the engine still running.

When Salisbury later went to Agent Bubela, he denied being present during the murder. He told Agent Bubela that Brash had told him that the murder weapon and some bloody clothes had been thrown away in the vicinity of Shun Pike. Salisbury accompanied Bubela to the area, which was then searched, but nothing was ever found.

Salisbury later admitted that he had been lying when he told Bubela this story, and he said that he had no idea where the gun or bloody clothes were located.

A total of thirty-seven witnesses testified for the state and approximately sixty exhibits were introduced into evidence. Private citizens and police and firefighters attested to the time and place the burning car was found, the presence and position of the body, and the fact that the car was stolen. State and federal investigators described the surveillance of the stolen-car operation in which Heaney had been involved, his impending Connecticut prison sentence, and his inclination to provide information in exchange for leniency. Much testimony and physical evidence was devoted to describing a large cache of weapons and ammunition seized from the so-called Lawton Farm. There, according to Salisbury, Fred Lawton, the owner of the farm, had made available to Brash, Fountaine, Salisbury, and others a number of firearms. These guns were used for target practice at the farm. Weapons and ammunition seized from the farm were introduced into evidence even though the state conceded that none of these weapons had been physically linked to Heaney's murder. The state argued at trial and on appeal that the impression it sought to establish by means of these guns was that defendants and Lawton and Salisbury were among the individuals relied upon to perform murders for hire and that Heaney's murder was one such killing. Neither defendant testified at trial, nor did either present any evidence, with the exception of the autopsy report introduced into evidence by Fountaine.

The defendants base their appeal on a total of fifteen issues, but we limit our discussion to the two issues that are dispositive of this appeal. They are the alleged hearsay-bolstering testimony from Agent Bubela and Lieutenant Moffatt about their conversations with Salisbury and the admission into evidence of the Lawton Farm testimony and guns.

We begin by recognizing that the question of whether evidence is relevant and therefore admissible is a determination resting within the sound discretion of the trial justice. *State v. Pemental,* 434 A.2d 932 (R.I.1981); *State v. Byrnes,* 433 A.2d 658 (R.I.1981). This discretion, however, is not without bounds, *State v. Tavarozzi,* 446 A.2d 1048 (R.I.1982), and

"[i]n analyzing whether reversible error has been committed, we focus upon similar considerations with respect to either the exclusion or inclusion of objectionable evidence. * * * As for the inclusion of objectionable evidence, such error is harmless if 'it is not reasonably possible that such evidence would influence an average jury on the ultimate issue of guilt or innocence.'" *State v. Bowden,* 473 A.2d 275, 280 (R.I.1984) (quoting *State v. Bowden,* 439 A.2d 263, 269 (R.I.1982)).

# I

## THE BOLSTERING TESTIMONY

At trial Lieutenant Moffatt and Agent Bubela were permitted to testify about their conversations and dealings with Salisbury. Much of this testimony, which came in on direct examination over defendants' objection, involved the recitation of Salisbury's statements to them concerning the details of Heaney's murder. The defendants assert that this was hearsay not within any recognized exception to the hearsay rule and therefore inadmissible. Furthermore, they argue that this testimony was by law-enforcement officials who are "cloaked" with the authority of the state, thereby impermissibly bolstering Salisbury's already questionable credibility. The defendants also contend that the prejudicial effect of the hearsay was aggravated by the fact that Bubela and Moffatt were allowed to testify about their opinions concerning the truthfulness of Salisbury's statements to them.

 Without arguing initially on the merits of the hearsay issue, the state main-

tains that defendants chose to delve into the content of Salisbury's conversations and dealings with Bubela and Moffatt through their objections during the direct examination and questions calling for hearsay answers during their cross-examination of the witnesses. Consequently, the state argues, they should not be allowed to "step forward [now] and claim reversible error in the admission of selected portions of [that testimony]." We note that defendants unsuccessfully attempted to prevent the admission of that entire line of testimony. The trial justice, however, ruled in favor of its admissibility. This being the case, defendants could not reasonably have been expected to forgo full and effective cross-examination of the witnesses once the out-of-court statements had been admitted. Had they done so, the state might well have argued that defendants had waived their appellate rights on the issue. The defendants' reaction to the direct testimony in no way impairs their ability to preserve and argue the issue on appeal.

■ We adhere to the well-established rule that "[g]enerally, an out-of-court statement, oral or written, made by a declarant and offered for the [truth] of the matter asserted constitutes hearsay and is inadmissible in evidence" unless it comes within one of the recognized exceptions to the hearsay rule. *State v. Coppola*, 502 A.2d 802, 804 (R.I.1985). Apparently suggesting that the testimony complained of was not hearsay and not offered to buttress Salisbury's credibility, the state asserts that it "was not intended to show that Salisbury told them the truth; indeed, both witnesses testified that some of what he told them was not true." Although it is clear from the witnesses' testimony that Salisbury was at times less than candid with them, we find the state's assertion on appeal somewhat disingenuous in view of the fact that its position was directly contrary at

trial. The following excerpt from the sidebar conference at trial concerning the admissibility of the statements unequivocally demonstrates this point.

"Prosecutor: *The State's position, Your Honor, is that they'll in fact corroborate Mr. Salisbury.* In addition to that, they'll set a scenario of a pattern of events as they relate to William Salisbury reaching out to law enforcement; his condition at the particular time, and the detail that he had with respect to the particular case prior to the State Police becoming involved, *lending credibility to his story * * *.*" (Emphasis added.)

The second defense attorney joined in the objection but they were overruled.

It is very clear that Salisbury's out-of-court statements were introduced to support Salisbury's credibility prior to his ever taking the stand and ultimately to prove that the murder occurred in the manner described by Salisbury, that is, that Brash and Fountaine killed Heaney. We therefore conclude that the out-of-court statements were hearsay.[1] Even so, the statements may be admissible if they could have been cast as any one of the numerous exceptions to the hearsay rule. The testimony, however, was not offered as prior inconsistent statements or to rebut a claim of recent fabrication, nor could they have legitimately been offered as such because Salisbury had not yet testified. Under the facts of this case, the statements were not susceptible of characterization as spontaneous utterances or as declarations against interest. We have carefully considered all the exceptions to the hearsay rule, and we conclude that none of them apply to render these statements admissible.

Finally, the state argues that even if some of the testimony were inadmissible under traditional hearsay analysis, it would still be admissible under the principles an-

---

1. The state cites authority for the premise that the statements would not be hearsay if introduced to show that Salisbury made the statement even if it was false or to show that it was information someone acted on, whether or not the information itself was true. Those authorities are not helpful in this case because the state sought to prove that Salisbury's statements were true.

nounced in *State v. Long*, 488 A.2d 427 (R.I.1985), because Salisbury testified at trial and was subjected to thorough and rigorous cross-examination. In *Long* we permitted the use of police officers' testimony concerning a pretrial identification of the defendant at which they had been present. Because of the generally greater reliability of pretrial identifications and because the identifying witness was present at trial and made an in-court identification, we concluded that "[a]11 danger of hearsay is avoided, and the possible prejudicial impact of such testimony is mitigated by the opportunity for confrontation and cross-examination of the declarant." *State v. Long*, 488 A.2d at 430. The state asks that we extend the reach of our holding in *Long* to embrace the circumstances of this case. We decline to do so.

In *State v. Coppola*, the state relied heavily upon *Long* in support of its argument that the hearsay testimony of two police officers about a pretrial identification was proper. In *Coppola* the identifying witness took the stand but never identified the defendant at trial. In holding that the testimony was inadmissible, we explained that the parameters of *Long* were limited; pretrial identification testimony is admissible only when the identifying witness is available at trial and subject to confrontation and cross-examination. *State v. Coppola*, 502 A.2d at 805–06. We emphasize again that prior out-of-court statements, whether consistent or inconsistent, are not admissible as substantive evidence and that a "prior consistent statement is inadmissible to buttress the in-court testimony of a witness in the absence of impeachment and the need for rehabilitation." *Id.* at 805 (citing *State v. Ouimette*, 110 R.I. 747, 298 A.2d 124 (1972)).

In this case it is understandable that the state would have desired to use the testimony of Moffatt and Bubela to "corroborate" and bolster Salisbury's testimony.

There was little or no physical evidence actually linking either of defendants to Heaney's murder; Salisbury's testimony was essential to the state's success in establishing that link. Without this court's impugning his credibility, suffice it to say that in light of his criminal record alone, Salisbury's inclination toward veracity and good character was subjected to damaging cross-examination. The only "corroboration" that Moffatt and Bubela could provide was that Salisbury told them a substantially similar story when he met with them in September and October of 1981. Of course there were variations in the three versions that may or may not have been significant, but it is important to note that law-enforcement authorities were largely unable *physically* to corroborate the details Salisbury provided in his description of the incident.[2] Thus it is clear that a finding of guilt or innocence in this case turned on Salisbury's ability to convince the jury that he was telling the truth, and in that sense, Salisbury was as much on trial as Brash and Fountaine.

The state presented Agent Bubela to help Salisbury with that task. Bubela was permitted to testify about details of the murder described to him by Salisbury. The state then produced Lieutenant Moffatt to describe the details of the murder, as told to him by Salisbury. Finally, the state placed Salisbury himself on the witness stand to describe the chain of events occurring on the evening of April 12 and culminating in the murder of Heaney. The result of this strategy was that the jury heard this evidence three times through three witnesses only one of whom, however, had any first-hand knowledge of those events. Two of the three witnesses were law-enforcement officials, testifying about the hearsay statements of a convicted felon who had admitted to being a willing participant in the murder and who had

---

**2.** Salisbury did describe vehicles that he said had been used in the murder and he identified them as belonging to Fountaine and Brash. Police were able to corroborate defendants' ownership of two of the three vehicles (the third was never found) but tests performed on the vehicles failed to reveal any physical connection with Salisbury's version of the murder.

received immunity for the crime in exchange for his testimony as long as he had not pulled the trigger.

In *State v. Burgess*, 465 A.2d 204 (R.I. 1983), we reversed a conviction of sexual assault because the physician treating the victim was permitted to testify about the details of the alleged assault as told to her by the victim. These hearsay statements were extremely prejudicial because they came in through a physician, one "clothed in the garb of a medical expert possess[ing] substantial stature in the eyes of a jury." *Id.* at 207 (quoting *State v. Pina*, 455 A.2d 313, 315 (R.I.1983)). We find that Moffatt and Bubela would have been endowed with similar stature and enhanced credibility in the eyes of the jury because they are law-enforcement officials cloaked in the authority of the state. Using the officers as a source of greater credibility for Salisbury's testimony was improper. As was the case in *Coppola*, "the production of prior statements through the testimony of police officers * * * enormously enhanced the quality of doubtful testimony by glossing it with a patina of certainty through the eyes of others." 502 A.2d at 806. Consequently, the bolstering testimony of Bubela and Moffatt, offered for the purpose of supporting Salisbury's credibility, should not have been admitted into evidence.

Moreover, the prejudice created by their testimony was exacerbated by the fact that Moffatt and Bubela were allowed to testify about their own affirmative beliefs concerning Salisbury's truthfulness. In *State v. Castore*, 435 A.2d 321 (R.I.1981), we were confronted with a sexual assault case in which a medical doctor testified that it was his opinion that the victim had been sexually assaulted. That opinion was not based upon medical evidence

"but solely on what she had related to him about what went on within the walls of the Castore home. Because his opinion was based on evidence that was not within the realm of his medical capabilities or expertise, and in fact was based on testimony that had already been

presented to the jury, it amounted to nothing more than his assessment of the credibility of [the victim's] testimony. It is beyond dispute that a determination of the credibility of a witness is solely within the purview of the jury." *Id.* at 326.

We do not believe that the jury would have remained unaffected in the face of such testimony. The assessment of Salisbury's credibility was an issue to be resolved exclusively by the jury within the four walls of the jury room. *See State v. Olink*, 507 A.2d 443 (R.I.1986); *State v. Fenner*, 503 A.2d 518 (R.I.1986); *State v. Desmarais*, 479 A.2d 745 (R.I.1984); *State v. Nicoletti*, 471 A.2d 613 (R.I. 1984).

## II

### LAWTON'S FARM

■ The defendants argue that prejudicial error was also committed when evidence seized from Lawton's farm was introduced at trial. Salisbury testified that Fred Lawton had made his farm and a large supply of weapons available to Brash, Fountaine, Salisbury, and others for target practice. (Of the fifteen guns seized from the farm, eight were made full exhibits. They were a .22–caliber rifle, a shotgun, a rifle and scope, a Colt revolver, a .25–caliber handgun, a .9–millimeter automatic or semiautomatic handgun, a .357–magnum handgun, and a BB gun.) The defendants assert that the evidence should have been excluded both because it was irrelevant to the crimes with which they had been charged and because it was evidence of uncharged misconduct. The state contends that the guns, ammunition, and other evidence from Lawton's farm was relevant and admissible evidence establishing that defendants were involved in an "ongoing scheme for their use."

The trial justice considered these arguments at a pretrial hearing on defendants' motion in limine. The defendants were also seeking an exclusionary ruling in their motion regarding testimony about Salisbury's and defendants' involvement in a murder that had been committed in Florida.

The trial justice found that this evidence of an unrelated crime was inadmissible because it would be unduly prejudicial to defendants, and he granted the motion relating to that evidence. Citing *State v. Jalette*, 119 R.I. 614, 382 A.2d 526 (1978), he found that the Lawton Farm evidence was admissible because it "pertains to knowledge, intent, motive, design, plan, scheme, system, or the like, and that it shows preparation to perform the ultimate act, and I think [it] should not be precluded and properly [is] admitted as an exception" to the general rule that evidence of other unrelated criminal activity is inadmissible. In so finding, the trial justice ruled that any prejudicial effect created by the admission of this evidence was outweighed by its probative value.

As we have already stated, the decision concerning the issue of relevance of evidence is a matter within the sound discretion of the trial justice. *State v. Byrnes*, 433 A.2d 658 (R.I.1981); *State v. Burke*, 427 A.2d 1302 (R.I.1981). "This determination, however, may have an important bearing on the rights of the accused because irrelevant evidence may also be prejudicial and its introduction at trial may constitute reversible error." *Burke*, 427 A.2d at 1304. Consequently, we look to the record to evaluate the probable impact of the challenged evidence upon the jury.

As the trial justice noted, "Generally, evidence of independent, past criminal behavior unconnected with the crimes for which the defendant is on trial may not be used to show commission of the crime charged even though it is criminal activity of the same type." *State v. Pignolet*, 465 A.2d 176, 179 (R.I.1983). The rational underpinning of this rule is that such evidence may be unduly prejudicial and tend to "cause confusion in the jurors' minds and divert their attention from relevant evidence." *State v. Burke*, 427 A.2d at 1304. This court, however, has held that an exception to the general rule exists when the evidence is offered to "establish guilty knowledge, intent, motive, design,

plan, scheme, system, or the like." *State v. Colangelo*, 55 R.I. 170, 174, 179 A. 147, 149 (1935). *See State v. Pignolet*, 465 A.2d 176 (R.I.1983); *State v. Jalette*, 119 R.I. 614, 382 A.2d 526 (1978). We also admonished, though, that "this type of evidence should be sparingly used by the prosecution and only when reasonably necessary." *Jalette*, 119 R.I. at 627, 382 A.2d at 533.

In this case the state asserted that it desired to show, through the admission of a large variety of rifles and pistols, a cache of ammunition, and testimony about various activities at Lawton's farm, that defendants were in a constant state of preparedness to commit murders. The state conceded, however, that none of these weapons had been physically linked to Heaney's murder. Salisbury testified that neither the weapon actually used in the murder nor the weapon that he said he brought with him on the night of the murder came from Lawton's farm. He and defendants had fired the other guns at the farm for practice and to test them for use "in some type of crime" but Salisbury never testified that any of these weapons had been used in the commission of a crime. Salisbury said that Heaney's murder had not been planned at the farm, nor had any of the target practice been in preparation for Heaney's murder. There was no independent evidence produced corroborating Salisbury's claim that defendants had taken part in these activities. Several police officers testified that none of the guns had been examined for fingerprints; they had simply been seized from the farm on the basis of Salisbury's statements. Several .38-caliber spent bullets found at the farm were tested, but they did not match those taken from Heaney's body. None of the other spent cartridges or bullets found on the farm premises were tested to see if they had been fired by the guns in evidence. As Lieutenant Moffat testified:

"A: I never had any reason to have them tested. I didn't think at the time I did.

"Q: So in other words, all you went by was what Salisbury told you?

"A: That's correct. It's strictly on the statement of William Salisbury."

Our examination of the record reveals that a great deal of time and energy was exerted in the admission and explanation of this evidence. Several police officers testified about the location of and condition in which the weapons had been found and the condition of the target-practice area. The attention paid to this evidence and the sheer number and variety of the guns convince us that the probative value of this evidence, whose relevance and materiality rested on shaky ground, was clearly outweighed by its prejudicial effect. There is no question that the evidence could and probably did tend to convince the jury that defendants were bad people who might be predisposed to commit crimes of violence. Such an inference might have been permissible had the state been able to show that the activities at the farm were part of the preparation for or scheme in the murder of the victim. The state's evidence, however, established that any preparation for the crime took place miles away from Lawton's farm, which was also not the source of any of the weapons used that night.

Even accepting everything Salisbury said as true, the evidence was simply insufficient to lay an adequate foundation linking the defendants' activities with Heaney's murder, and any adverse inferences drawn from those activities were impermissible in this murder trial. As this court has said, "the admission into evidence in criminal cases of weapons that are not alleged to be the weapon used in the commission of a crime is fraught with the probability of error." *State v. Souza*, 110 R.I. 261, 269, 292 A.2d 214, 219 (1972). We therefore conclude on the facts of this case that the principles regarding materiality and relevance enunciated in *Jalette* and its progeny do not provide a basis for the admission of the Lawton Farm evidence. The evidence from and about Lawton's farm should have been excluded because, like the unrelated incident in Florida, it is not probative in the matter of the identity of Heaney's killer

and it is highly prejudicial. We find that the admission of this evidence, as well as the admission of the bolstering testimony, was unduly prejudicial to the defendants and is reversible error.

For these reasons, the defendants' appeal is sustained, the judgments of conviction are vacated, and the case is remanded to the Superior Court for a new trial.

BELIVACQUA, C.J., did not participate.