STATE

v.

Robert SABETTA.

No. 95–67–C.A.

Supreme Court of Rhode Island.

July 10, 1996.

Annie Goldberg and Aaron Weisman, Providence, for Plaintiff.

Paula Rosin and Richard Casparian, Providence, for Defendant.

## OPINION

MURRAY, Justice.

This case comes before us on the appeal of the defendant, Robert Sabetta (defendant), from judgments of conviction following a jury trial on three counts of first-degree murder and one count of assault with intent to commit murder. The defendant was sentenced to consecutive life sentences on each count of murder, and he received a twenty-year sentence on the assault-to-commit-murder charge. We affirm. The facts of the case insofar as pertinent to this appeal are as follows.

On the evening of April 13, 1993, the murder victims in this case, Frank Sherman, his brother, Charles Sherman (Frank, Charles, or the Shermans), and a friend, Jeremy Bullock (Bullock), were working on their cars in a garage at Wilson's Auto Sales located on Route 6 in Foster. The Shermans' cousins, Darrell Drake (Drake) and Michael Clausen (Clausen), were also present in the garage, working on their cars.

Around midnight the Shermans' black Labrador retriever, Chocolate, began to bark continuously outside the garage; Charles told Frank to go outside to investigate why the dog was barking. Clausen, who was at that moment getting under his own car to fix its transmission, testified that he heard something that sounded like firecrackers and feet scuffling around in the dirt. The next thing Clausen heard was a noise inside the garage which sounded like a gunshot. He heard Bullock grunting "like he was in pain, like something was hitting him." From beneath his car Clausen peered out and saw Bullock's feet pointed upward, as if he had fallen backward. As he attempted to retreat under his car, he heard someone say, "You're going to die." He then heard another shot. From underneath his car, he could see a person wearing a pair of dark blue pants that had a light blue stripe down the side. Clausen recognized the colors of the pants as those he associated with a Foster police officer's uniform. The person was also wearing

a pair of black boots. Clausen could not see the assailant's face. He watched the person walk around to the passenger side of his car, where Charles had been sitting. He then heard two shots and a gasp from Charles. The next thing he saw were shell casings falling to the floor near the assailant's boots. Clausen waited a short while before crawling out from beneath his car. When he sat up, he observed that Charles had been shot in the face. Clausen ran out of the garage, and as soon as he got outside, he saw Bullock lying on his back, also apparently shot. Clausen was able to get into his car and drive home where he reported the shootings to his parents, who summoned the police.

At the time Frank went to investigate the dog's barking, Drake had been sitting in the front seat of his car, working on his radio. He testified that he heard loud bangs which shook the garage. He then saw a dark-complected man, with short hair and glasses, pointing a gun at him from a distance of about six or seven feet. Drake jumped out of the way, and heard another shot, and jumped across the console of the car and onto the floor. He fell out the passenger-side door, where he saw the body of Bullock lying on the ground. Drake saw a person who was wearing black boots heading toward the back of the garage. Drake then got up and ran out of the garage. As he was running, he heard more shots being fired in the garage. Drake then realized that he had been shot. He stopped on the side of the road because he was experiencing difficulty breathing. From this position he heard the sound of squealing car tires. He then saw a light-colored Grand Marquis or Crown Victoria drive quickly past him with its headlights off. Drake then ran to the first house he saw and asked its residents for help. Police responded to the call to the location, and Drake was taken by ambulance to a hospital for treatment of his injuries. On April 14, 1993, while he was hospitalized, Drake picked defendant out from a police photo lineup as the person who shot him. Drake also made an in-court identification of defendant at trial.

Sergeant Samuel Mooney, a member of the Foster police department, was on duty the night of the shootings and testified that he responded to the call to the garage. Foster Sergeant William Chapman had already arrived and was waiting for additional police units to respond before searching the garage. A number of State Police units also responded to the call. The defendant immediately became a suspect in the shootings on the basis of information received by law enforcement authorities. Several municipal police units, including those in Johnston, Cranston, and Scituate, were notified to be on the lookout for defendant's car, a gray-colored 1990 or 1991 Ford LTD Crown Victoria bearing Rhode Island vehicle registration No. 77712.

At approximately 3:30 a.m. on April 14, 1993, defendant was observed driving his car in Cranston, where he resided. Cranston police officers stopped defendant's vehicle without incident, and defendant was taken into the custody of the State Police. He was arrested and arraigned for the murders of the Shermans and Bullock, and he was charged with assault with intent to commit murder on Drake.

At the time of the murders defendant was suspended without pay from his position as a Foster police officer after having been indicted by a grand jury on March 23, 1993. The defendant was indicted for assault with a dangerous weapon upon Frank in an incident occurring in January 1993 during a vehicle stop by defendant while he was on duty. This incident, and defendant's subsequent indictment and suspension from the police force, served as the basis of defendant's motive to commit the murders.

Law enforcement authorities did not immediately locate the gun which was believed to have been used in the shootings, a Ruger .357 magnum revolver. However, two weeks after the murders a similar gun was found by a person who was fishing beneath the Gold Star Bridge in Groton, Connecticut. The serial number on the gun had been removed, and the barrel of the gun had been ground down. There were six spent cartridges remaining in the gun, which was immediately turned over to the Groton police. The defendant possessed a weapon similar to the gun

which was found while he was employed by the Foster police department.

After the State Police obtained the .357 magnum found in Groton, in order to determine whether the guns were the same they extracted bullet projectiles from a tree upon which defendant had used a gun to practice target shooting. A ballistics expert testified that the bullets extracted from the tree had been fired from the .357 magnum found in Groton.

Police also obtained metal filings from defendant's residence for examination. Federal Bureau of Investigation forensic metallurgist, William Tobin, testified that the particles seized from defendant's residence were similar in composition to the material making up the barrel of the revolver which had been recovered by police.

The defendant was found guilty by a jury on June 11, 1994, of the first-degree murders of the Shermans and Bullock and of assault with intent to commit murder upon Drake, from which verdict he has filed the instant appeal. On appeal defendant raises five issues which we shall address in the order in which they are presented in defendant's brief. Further facts will be supplied in later portions of this opinion as necessary.

The defendant's first assignment of error on appeal is that the trial justice erred in denying his pretrial motion to suppress statements he made to the police following his arrest after he unequivocally asserted his right to remain silent.

State Police Trooper John Leyden (Leyden) had a conversation with defendant in the rear seat of the police cruiser where defendant was being held following his arrest. Leyden advised defendant of his *Miranda* warnings from a printed *Miranda* warning card. After Leyden advised defendant of his rights, Leyden asked defendant if he understood them, to which question defendant responded, "Yeah, I'm a cop." The defendant then made several statements to Leyden. He said, "Wow, this is big. I must be in some trouble." Then defendant, nodding toward the northern part of the state, said, "What, another one up there?" Leyden asked defendant where he was coming from.

The defendant responded that he was coming from Mister Donuts. He then indicated that he had his off-duty gun on the floor of the rear seat. Leyden asked defendant if he had any police uniforms in his car, to which question defendant responded negatively, indicating that he was "on suspension for another thing in Foster." The defendant then informed Leyden that he did not wish to talk further because there were too many television cameras around but that he would speak with him further at police barracks.

The defendant was then transported to State Police headquarters where he made additional statements to police. Sergeant Gerald Prendergast (Prendergast), who was in charge of the murder investigation, spoke with defendant in a conference room along with Prendergast's partner, Detective James Demers (Demers). Prendergast read defendant his *Miranda* warnings from a printed form, which defendant signed, indicating that he understood his rights.

Prendergast and Demers asked defendant questions in respect to the crime scene and his participation in the crimes. The defendant did not answer the questions directly but responded, "Wow, this is big, ain't it?" He also stated: "I'm in a lot of trouble. You don't understand the pressure I'm under. The war is over. I really don't want to waste your time, but I don't want to talk about it right now. I understand you're doing your job. I don't want to talk about it right now. You can understand that can't you?"

The defendant then asked if he could speak with the chief of police of Foster. This request was granted, and defendant spoke with him for approximately forty-five minutes. During this private conversation defendant did not make an admission of guilt in respect to the crimes; however, Prendergast testified that after defendant's visit with the chief of police of Foster, defendant stated, "I really fucked up, didn't I?"

The defendant then spoke with his father in the presence of Prendergast and Demers. During their conversation defendant's father asked defendant whether he wanted an attorney. The defendant stated that he did not desire an attorney at the present time. After defendant's father left, Prendergast and

Demers again asked defendant if he wanted to speak with them. The defendant responded, "I need help." When they asked him if he wanted to tell them what happened, defendant stated, "I do, but I want to talk to my attorney first." According to Prendergast, at this point all questioning of defendant ceased. The defendant was then offered the opportunity to make a phone call and was taken to the cell block.

The defendant consulted with his attorney on the morning of April 14, 1994, and was later arraigned. Sometime after the arraignment Prendergast, Demers, and Leyden went to the cell block to advise defendant that he would be transported to the Adult Correctional Institutions (ACI). In response defendant asked, "What's going to happen? What's the procedure?" It was explained to defendant that he would be transported to the ACI by a member of the State Police and that he would be treated as any other prisoner. The defendant then made additional statements. He again stated that he was in big trouble and that it looked as if he would not be a cop any longer. He stated that "there was always going to be someone out there like him, just like the guy in Massachusetts a month or so ago." Prendergast testified that he interpreted this statement as referring to a man who was recently in the news for having shot and killed his girlfriend and estranged wife. The defendant appeared emotionally upset at the time and asked for a few minutes to be alone before being taken to the ACI, which request was granted.

In presenting his motion to suppress to the trial justice, defendant pursued a number of arguments. The defendant first contended that his statement "I don't want to talk about it right now" was the equivalent of an invocation of his right to remain silent and that the police should have immediately stopped all questioning. The defendant also contended that permitting the chief of police of Foster and his father to speak with him while he was being held at the State Police barracks were ploys intended to soften or coax him into a more cooperative state of mind. In addition defendant argued that having three members of the State Police inform him that he would be taken to the ACI was "a fork intended to evoke responses from him."

In rendering his decision on defendant's motion to suppress, the trial justice noted that there could be no doubt that defendant, a former police officer, understood the *Miranda* warnings which were administered to him by police on two separate occasions. The trial justice dismissed defendant's arguments that the police's permitting the chief of police of Foster and defendant's father to speak with him and later telling him that he would be taken to the ACI were attempts to evoke responses from him. The trial justice concluded:

"[Under] the totality of the circumstances as reviewed by the Court, including my evaluation of the credibility of the witnesses, I am satisfied that there is clear and convincing evidence to support a finding by the Court that the Miranda warnings were given to the defendant orally by Leyden and before he signed the rights form and was interrogated at headquarters. The Court further finds that the defendant knowingly, intelligently and voluntarily waived his right to have counsel present and waived his right not to incriminate himself. The Court, therefore, finds that the defendant's Fifth Amendment rights were not violated; and his motion to suppress is therefore, denied."

The issue of the admissibility of defendant's statements to the police was again raised during the course of the trial immediately prior to Prendergast's testifying. The trial justice ruled, over defense counsel's objection, that defendant's statement "I don't want to talk about it right now" did not constitute an unequivocal invocation of his right to remain silent. However, the trial justice ruled that testimony about defendant's assertion of his right to counsel was inadmissible.

■ It has been well established that no statement made by a criminal defendant may be admitted into evidence unless the state can prove that the defendant voluntarily, knowingly and intelligently waived his or her *Miranda* rights. *State v. Marini*, 638 A.2d 507, 511 (R.I.1994). If an accused requests an attorney before questioning or during

questioning, police must cease interrogation of the individual. *Miranda v. Arizona*, 384 U.S. 436, 473–75, 86 S.Ct. 1602, 1627–28, 16 L.Ed.2d 694, 723 (1966). Statements will be deemed admissible when they are truly voluntary. *Id.*, at 478, 86 S.Ct. at 1630, 16 L.Ed.2d at 726. "In determining whether an accused waived his [or her] *Miranda* rights, we are required by the Supreme Court to inquire into the 'totality of the circumstances surrounding the interrogation.'" *State v. Leuthavone*, 640 A.2d 515, 519 (R.I.1994). If the suspect effectively waives his or her right to counsel after receiving the *Miranda* warnings, law enforcement authorities are free to question him or her. *North Carolina v. Butler*, 441 U.S. 369, 372–76, 99 S.Ct. 1755, 1756–59, 60 L.Ed.2d 286, 291–94 (1979).

■ After reviewing the record of the suppression hearing, we are of the opinion that the trial justice properly concluded that in the totality of the circumstances defendant knowingly, intelligently, and voluntarily made the statements to the police. There was no evidence suggesting that defendant did not understand the nature of the *Miranda* warnings. Indeed, the evidence demonstrates that defendant clearly understood, as a former law enforcement officer, the nature of the warnings and the consequences of a waiver. Thus, we are persuaded that he knowingly and intelligently waived his right to remain silent. Moreover, there is nothing in the record before us to suggest that the statements by defendant were not made voluntarily.

■ We reject defendant's contention that his oral statement to the police "I don't want to talk about it right now" constituted an unequivocal invocation of his right to remain silent. Invocation of the right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *McNeil v. Wisconsin*, 501 U.S. 171, 178, 111 S.Ct. 2204, 2209, 115 L.Ed.2d 158, 169 (1991). If a suspect makes a statement that is equivocal or ambiguous in that a

reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents and those of the Unites States Supreme Court do not require the cessation of questioning. *See id.*

In the instant case defendant's statement was not a clear articulation of his desire to remain silent. We are of the opinion that the words "right now" operated to qualify and limit defendant's intent to remain silent only in regard to the moment. Consequently we are persuaded that defendant's statement did not constitute an unequivocal invocation of his right to remain silent and the police were not required to stop questioning him.

The defendant next complains that the trial justice abused his discretion in refusing to permit a proposed expert witness for the defense to testify concerning the reliability of eyewitness identifications. The defense attempted to introduce evidence, through a psychologist, that many factors affect a witness's memory, recollection, and perception, including stress or observation of a weapon, and that these factors affect the reliability of eyewitness identifications. The defense specifically sought to proffer this evidence under Rule 702 of the Rhode Island Rules of Evidence [1] in order to demonstrate the unreliability of Drake's identification of defendant as the assailant.

In rendering his decision on the admissibility of the proposed evidence, the trial justice expressed some doubts about its reliability. The trial justice ruled, inter alia, that *State v. Porraro*, 121 R.I. 882, 404 A.2d 465 (1979) "still pertains" and that "to allow the testimony would serve more to confuse the jury than to assist it." He noted that "there is too great a danger in allowing testimony labeled expert if the requisite reliability is absent especially * * * where the subject matter is within the comprehension and knowledge of the jurors * * * ." He therefore refused to permit the defense to introduce any expert testimony on the factors that affect eyewitness identifications.

1. Rule 702 of the Rhode Island Rules of Evidence provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of fact or opinion."

On appeal defendant argues that contrary to the trial justice's ruling, the state of current scientific research in the realm of eyewitness identification is such that expert testimony in the area easily meets the requirements of Rule 702. Further, defendant contends that expert testimony concerning factors that affect the reliability of eyewitness identification should be admitted when the identification evidence is either the sole or the most significant evidence of guilt and the expert's testimony relates to specific variables involved in the identification.

The state contends that the trial justice correctly excluded the proposed expert testimony on eyewitness identification. It urges this court to uphold the trial justice's exclusion of the expert testimony on the basis of this court's decision in *State v. Porraro*, 121 R.I. 882, 404 A.2d 465 (1979), and its progeny.

In *Porraro* this court addressed a claim identical to that now being pursued by defendant. In that case, which was decided by this court prior to this state's adoption of the Rhode Island Rules of Evidence, defense counsel made a pretrial motion to introduce the expert testimony of a psychologist concerning the unreliability of eyewitness memory. The trial justice excluded the testimony on the basis that it would effectively invade the province of the jury and because it would open a floodgate whereby experts would testify on every conceivable aspect of a witness's credibility. *Id.* at 892–93, 404 A.2d at 471. This court upheld the exclusion of the expert testimony on the issue of eyewitness identification and concluded that the trial justice did not abuse his discretion because "the subject matter of the proffered testimony * * * was not beyond the ken of the jurors * * * ." *Id.*, at 892, 404 A.2d at 471; *see also State v. Gardiner*, 636 A.2d 710, 714 (R.I.1994) (trial justice did not abuse his discretion in excluding expert testimony on eyewitness identification on relevancy grounds); *State v. Gomes*, 604 A.2d 1249, 1256 (R.I.1992) (expert testimony on eyewitness identification properly excluded when introduction of such evidence could only confuse or mislead the jury).

■ Even assuming that the proposed testimony on eyewitness identification satisfied the requirements of Rule 702 and was reliable, we are persuaded that the trial justice acted well within the bounds of his discretion when he excluded this testimony in the instant case. The trial justice specifically found that the subject matters of eyewitness identification and memory were within the comprehension and knowledge of the jurors. Moreover, the trial justice found that introduction of the expert testimony would confuse rather than assist the jury in this case. Hence, we are of the opinion that the trial justice was not clearly wrong in excluding the proffered testimony. *See Gomes*, 604 A.2d at 1256; *Porraro*, 121 R.I. at 892–93, 404 A.2d at 471.

The defendant next complains that the trial justice committed reversible error when he permitted the state to introduce into evidence items seized by the police in searches of his residence and automobile. He asserts that the trial justice erred in overruling his objections to testimony by two State Police officers who had performed the searches. The first objection was made during the testimony of Sergeant Anthony Pesare (Pesare). Pesare was preparing to testify about the return of service prepared by him which listed items seized by the police from defendant's home, including such items as police uniforms, boots, and weaponry. At a sidebar conference, defense counsel objected to the testimony concerning the weapons and ammunition on the basis that the evidence "may be considered evidence of other crimes, or at least shown to establish a bad act on the part of the defendant." The trial prosecutor contended that the vast majority of the items testified to by Pesare were items expected to be in the home of a police officer and were offered with the intention of showing the importance to defendant of being a police officer. In respect to testimony concerning the presence or absence of particular types of weapons or ammunition, and the presence or absence of his combat boots, the prosecutor argued that testimony in these areas was relevant to the issues on the basis that several witnesses had previously testified about such items.

The trial justice ruled that the probative value of the testimony concerning the items far outweighed any prejudice to defendant resulting from its admission. Pesare then testified that numerous items had been seized from defendant's residence, which included "items of police gear, items of identification for [defendant] and numerous amounts of ammunition in general." He further testified that a .357 Ruger revolver had not been recovered, nor had ammunition for that type of a weapon been found. Pesare also testified that police did not find a pair of combat boots in defendant's home.

The next objection by defense counsel in connection with testimony about weaponry and ammunition was raised during the testimony of Detective Leroy Rose (Rose). Defense counsel specifically objected to the proposed testimony by Rose concerning the seizure of defendant's Glock, another gun, from his car. His objection to the introduction of this evidence was overruled by the trial justice. Rose then described to the jury the items seized from defendant's car. Among the items seized from the floor of the car were a loaded Glock .40 caliber firearm with laser-aim sight, a magazine clip containing twelve rounds of ammunition, and an "Uncle Mike's" holster. From inside the glove compartment the police seized a Glock .40 caliber loaded magazine with twelve rounds of ammunition, and from the ashtray the police seized one round of .40 caliber ammunition. Rose also testified that neither a .357 revolver nor combat boots were found in the search of defendant's car.

Although defense counsel did not request that the trial justice issue a limiting instruction to the jury or make a motion to strike the testimony he now alleges was erroneously admitted, defendant asserts on appeal that evidence that he possessed other firearms and ammunition had nothing to do with the crimes for which he stood trial. Therefore, defendant asserts, the admission of the testimony served no purpose other than to fix an image in the minds of the jurors of him as a violent, dangerous individual who was likely to commit the crimes at issue. The state counters that the evidence was properly admitted in order to assist the state in establishing the importance to defendant of being a police officer and how being deprived of that status affected him.

■■■ We are of the opinion that the trial justice in the instant case acted well within the bounds of his discretion in admitting the testimony relating to defendant's possession of other firearms and ammunition. The trial justice in the instant case determined that the evidence was relevant. Rule 401 of the Rhode Island Rules of Evidence defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." This court has indicated that it will "not consider a trial justice's ruling on relevancy to be reversible error unless it constitutes a prejudicial abuse of discretion." *Gardiner,* 636 A.2d at 714; *State v. Squillante,* 622 A.2d 474, 482 (R.I.1993).

The record does not persuade us that the trial justice abused his discretion in permitting the admission of this testimony; rather, it is our considered opinion that he made a careful decision after considering the arguments presented by trial counsel.

The defendant's reliance on *State v. Evans* 618 A.2d 1283 (R.I.1993), and *State v. Brash,* 512 A.2d 1375 (R.I.1986), is unfounded. In *Evans* this court concluded that the trial justice's questioning of the defendant in his trial for assault with intent to commit murder about his prior experience with guns was improper because the tenor of the trial justice's questioning contained prejudicial influences. *Evans,* 618 A.2d at 1284. In this case defendant had been employed as a police officer and possessed guns and ammunition in connection with his employment. Therefore, this is not a case in which the mere mention of defendant's possession of such items might have impermissibly suggested to the jury defendant's commission of unlawful activities.

The defendant's reliance on *Brash* is also inapposite to the situation presented in the instant case. In that case, a murder trial, significant testimony and evidence were admitted which related to a large cache of weapons and ammunition seized miles away

from where the murder took place, none of which could be linked to the crime. The only connection to the defendant was provided by the testimony of an informant who testified that the weapons were used by the defendants in target practice. This court ruled that the evidence should have been excluded because it was not probative in the matter of the identity of the killer. *Brash*, 512 A.2d at 1383.

In the instant case it was clearly established that defendant was the owner of the guns and ammunition. The testimony about the items was admitted for the purpose of showing defendant's identity as a police officer and the degree to which his position as a police officer pervaded aspects of his personal life. Further, we note that the testimony of Clausen indicated that the assailant had worn clothing similar to the uniform worn by Foster police officers. Thus the admission of this testimony was probative to the identity of the assailant. We therefore conclude that defendant was not prejudiced by the admission of this testimony on relevancy grounds.

In defendant's next assignment of error on appeal he argues that the trial justice erred in permitting the jury to view a videotape of the crime scene. The unnarrated video, approximately ten minutes in duration, was recorded by the State Police. The tape specifically reveals the condition of the garage on the night of the murders and shows the bullet-ridden bodies of the victims as each lay.

The defendant asserts that because numerous photographs were admitted into evidence depicting the victims and the crime scene, the trial justice erroneously overruled his objection to the jury's viewing the videotape on the basis that the tape was entirely repetitious of the contents of the photographs. Moreover, defendant maintains for the first time on appeal that the contents of the videotape were gruesome and that the tape was offered to arouse the passions of the jury.

The record indicates that the videotape was first objected to by defense counsel when the state marked it for identification. As grounds for the objection defense counsel stated at a sidebar conference that he objected to state's playing the video for the jury on the basis that it duplicated what was shown in photographs. The trial justice ruled that although "there may be some duplication, *the benefit that this videotape would have to this jury far outweighs the objection that the defendant may have with it being shown along with photographs being left in evidence.*" (Emphasis added.) He allowed the video to be played for the jury but denied the state's request to admit it as a full exhibit. In passing on its admissibility, he stated: "The Court, when it was explained to me what the video would show, I thought it would was important that the jury see what the scene looked like on the night of the incidents as described by the various witnesses and as shown in smaller segments in the photographs. I don't see any reason why the video ought to be marked a full exhibit at this time. The request that [the video] be a full exhibit is denied."

We are of the opinion that the trial justice did not err in allowing the state to show the videotape to the jury. As we reiterated last term in *State v. Hightower*, 661 A.2d 948 (R.I.1995), "unduly prejudicial evidence or prosecutorial comment is such that it so inflames the passions of the jurors as to prevent their ability to consider the evidence of the case impartially." *Id.* at 962 (citing *State v. Brown*, 522 A.2d 208, 211 (R.I.1987)). There is no dispute here that the contents of the video were unpleasant to view; however, the trial justice's finding that the relevancy of the evidence outweighed its prejudicial effect is supported by the evidence of record. Although there were numerous photographs admitted into evidence depicting the crime scene on the night of the murders, the video exhibited details not apparent in the photographs which would assist the jury in understanding the crime scene. Hence, we do not conclude that the video should not have been shown to the jury because it was duplicative of the photographs.

In his last assignment of error on appeal defendant contends that the trial justice erred in refusing to pass the case on the basis of an allegedly improper comment that the trial justice made in the presence of the jury. The comment was made during de-

fense counsel's cross-examination of Drake. Defense counsel was attempting to impeach Drake by implying that his trial testimony was not consistent with the statements he gave to the grand jury concerning the type of car he saw at the garage on the night of the murders. The prosecutor objected to a portion of the grand jury record quoted by defense counsel on the basis that it was "incomplete, misleading." Defense counsel maintained that "[i]t's not misleading." The following colloquy then took place between the trial justice and defense counsel in the presence of the jury.

"[DEFENSE COUNSEL]: Judge, I will do it in due course, get to that part of the examination.

"THE COURT: Why don't you ask the question now.

"[DEFENSE COUNSEL]: Because I don't want to ask it now. I want to conduct this cross-examination the way I see fit.

"THE COURT: You certainly have a right to cross-examine as you see fit. *But, you also have an obligation as an officer of the court not to mislead the jury, or at least in [the prosecutor's] thoughts mislead the jury by not asking the next question.*" (Emphasis added.)

Defense counsel then asked that the jury be removed from the courtroom. The attorneys and defendant then met at sidebar with the trial justice. Defense counsel moved to pass the case on the basis that the trial justice had improperly implied in front of the jurors that defense counsel was attempting to mislead them. The trial justice responded that "[m]y recollection as to what I said is, it has been suggested by [the prosecutor] that you were misleading the jury. I didn't say you were misleading the jury. Read back what I said." After having the stenographer read the portion of the transcript which contained the comment complained of, the trial justice denied the motion to pass the case. When the jury returned to the courtroom, the trial justice articulated the following admonition:

"Now ladies and gentlemen, the scope and manner and extent of cross-examination of a witness lies within the sound discretion of myself as the trial [j]udge.

[The prosecutor] objected to [defense counsel's] manner of cross-examination of Mr. Drake on a particular subject before we went to lunch. The Court finds that the procedure being followed by [defense counsel] in regard to this subject matter to be within the permitted bounds; and therefore, [the prosecutor's] objection, which is still on the record, is overruled.

"You are not to give any consideration at any time to comments or arguments made by counsel as reason for advancing his objection. Such comments have no place in your consideration of the issues presented during the course of this trial, along with my comments. *You are not to consider any comments I have made during their discussion between themselves,* nor concern yourself with the reason for my rulings here in this regard or any other ruling I may make during the course of the trial." (Emphasis added.)

On appeal the defendant maintains that the trial justice's comment caused him to suffer severe prejudice which could not be cured by the subsequent cautionary instruction. This argument is untenable. The comment made by the trial justice did not imply that *he* believed defense counsel was misleading the jury. Instead, the trial justice stated that the prosecutor believed defense counsel was misleading the jury. Therefore, contrary to the defendant's assertion on appeal, it cannot be said that the jury "upon hearing the comment * * * must have believed that the trial judge felt defense counsel was acting in a disreputable manner." The prejudice to the defendant, if any, as a result of the trial justice's comment was cured by the subsequent cautionary instruction given to the jury.

For the foregoing reasons the defendant's appeal is denied and dismissed. The judgments of conviction are affirmed, and the papers of the case are remanded to the Superior Court.