June 20, 2023

**Supreme Court**

No. 2021-218-C.A.
(P1/19-247B)

State                    :

v.                       :

Tony Reverdes.           :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email:    opinionanalyst@courts.ri.gov,    of    any typographical  or  other  formal  errors  in  order  that corrections may be made before the opinion is published.

|           |   |
|-----------|---|
| State     | : |
| v.        | : |
| Tony Reverdes. | : |

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.**  This case came before the Supreme Court on February 22, 2023.  The defendant, Tony Reverdes, appeals from a judgment of conviction of five counts of first-degree robbery and three counts of conspiracy to commit robbery.  On appeal, the defendant claims that the trial justice erred by failing to exclude certain statements the defendant made regarding firearms during a post-arrest police interview.  The defendant also assigns error to the denial of his motion for a new trial.  For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

### Facts and Travel

In early November of 2018, four businesses in Pawtucket were robbed by masked gunmen.  This crime spree was solved with quick dispatch by the Pawtucket

police. The first robbery occurred on November 1, 2018, around 7:15 p.m. at the No Limit Barbershop located at 168 Smithfield Avenue in Pawtucket. While the owner, Jorge Cardoso, was cutting a customer's hair, two masked men entered the shop, ordered the occupants to put their hands up and not to move, and announced, "[T]his is a robbery." As one intruder brandished a handgun, both men began "collecting wallets and I.D.'s and stuff from people" and "go[ing] through [the shop's] drawers * * *." Specifically, money was stolen from Vanessa Armand, an employee, a wallet and a cell phone from Jonathan Frink, a customer, a wallet from Stephen DeMacedo, another customer, and a set of car keys from Cristian Rodas, one of the barbershop's employees. His vehicle was stolen and served as the getaway car.

The second robbery took place six days later, around 7:30 p.m. on November 7, 2018, at Bella Vista Liquors located at 592 Weeden Street. Two men wearing masks entered the store. One of them wore a Boston Bruins sweatshirt and the other a gray sweatshirt; one held a gun and the other a backpack. At the time of the robbery, there were two individuals in the store—Teofilo Mourato, an employee, who was standing behind the checkout counter, and Geraldo Goncalves, a patron who was talking to Mourato. The intruders said, "You move, you're dead." While one man relieved Goncalves of his money, the other jumped over the counter and ordered Mourato to open the cash register. Rather than complying, Mourato said, "[T]here's people coming" and pushed a panic button. When the intruders saw the

cash register was not opening, they stole some bottles of vodka and left the store. This attempted robbery was captured on the store's surveillance cameras.

Approximately forty-five minutes later, Colonial Liquors, located at 128 Summit Street, Pawtucket, was the scene of another robbery. At the time, the owner, Michael Bogolawski, Sr., and his son, Michael Bogolawski, Jr., were inside. Mr. Bogolawski, Sr. noticed, via surveillance footage, an individual wearing a mask walking up to the store's window and looking in. Thinking this was strange behavior, he became nervous and began to walk towards the door to "check it out." However, before he could look outside or lock the door, two individuals entered the store. One sported a gray sweatshirt and a backpack. The other, in a red sweatshirt, was carrying a handgun. According to Bogolawski, Sr., the gun looked "like it was a .45 * * * like a semi-automatic. Similar to a Glock-style weapon or a * * * nineteen-eleven * * *." The man with the gun stopped Bogolawski, Sr. near the door while the other man went around the counter. Mr. Bogolawski, Jr., who was behind the counter, was ordered to open the cash register and give him everything inside; he complied. The other intruder loaded bottles of Hennessy cognac and other items into his backpack. The surveillance system captured the robbery on video.

The fourth and final holdup occurred the same day at Main Street Liquors. Two men entered the store. At the time, one employee, Kevin Mendes, and one customer were inside. One assailant jumped over the checkout counter while the

other pointed a gun at the customer. The intruders stole more than $2,000 and various bottles of liquor, including bottles of Hennessy and D'Ussé cognac. This robbery was also recorded by the store's surveillance cameras.

The following day, November 9, 2018, law enforcement officers sought to arrest Jordan Vieira, a nineteen-year-old man from Pawtucket, in connection with a stolen vehicle and the fraudulent use of a credit card. The officers learned that Vieira was staying with a friend, Noah Potter, a nineteen-year-old at the time of trial, who was also from Pawtucket. When the police arrived at the Potter house in search of Vieira, Potter's mother allowed them into the home and consented to a search. Evidence from the robberies was visible in the living room, including the backpack, black sneakers, bandanas, red fleece jacket, gray sweatshirt, bottles of liquor, and cash. Additional evidence was located in the basement, including the Boston Bruins sweatshirt, a gray sweatshirt, and the shoes Potter wore during the first robbery. Both Vieira and Potter were arrested and transported to the Pawtucket police station. Kevin DaSilva, a thirty-two-year-old man from Pawtucket who attended the New England Tractor-Trailer Training School with Vieira and who is defendant's cousin, was arrested on November 16, 2018. All three participants became cooperating witnesses. Vieira testified that he had committed all four robberies at the behest of

defendant, whom he referred to as his uncle.[1] DaSilva also provided testimony regarding the robberies. Lastly, Potter testified that he participated in the three liquor store robberies, but not the barbershop holdup.

The evidence revealed that Potter and Vieira had been close friends since fifth grade. On October 31, 2018, Vieira moved into Potter's home, which Potter shared with his mother, grandmother, and brother. Around that time, Vieira was spending a lot of time with defendant. According to Vieira, he and defendant would "[j]ust ride around" together and "smoke" marijuana. According to Potter, Vieira and defendant "would always be [together], driving around" and Vieira would "com[e] home late."

On the evening of November 1, 2018, Potter observed defendant's black BMW convertible pick up Vieira from the house. Vieira later told Potter that he and defendant drove to a barbershop on Smithfield Avenue in Pawtucket. The defendant then gave Vieira a gun and told him to rob the barbershop. Vieira testified that the robbery was defendant's idea and that defendant told him to steal a car. Vieira and his cousin Angelo Miranda then proceeded to rob the barbershop, taking money and cell phones from customers and employees. One customer was asleep and was awakened when Vieira hit him. Vieira also took a set of keys, which he used to steal

---

[1] During an interview with police, Vieira explained that defendant was not actually his uncle, but he referred to him as such because he had known him all his life.

a vehicle that was parked outside the shop. Vieira drove the vehicle a short distance and was picked up by defendant. The money and items from the robbery were divided among them.

Both Potter and Vieira testified that they committed the three liquor store robberies at the direction of defendant. While at the Potter home, sometime after dark, Vieira asked Potter if he wanted to go smoke; Potter agreed, and the two men went outside and got into a silver Chevy Impala, which DaSilva was renting at the time.[2] According to Potter, defendant and DaSilva were already inside the vehicle— DaSilva was driving and defendant was in the front passenger seat. The group drove to DaSilva's apartment, located across the street from Bella Vista Liquors. DaSilva went into his apartment and came back outside with a pair of gloves; defendant gave Vieira the same silver handgun used in the barbershop robbery and directed Vieira and Potter to go into the liquor store to "get money and grab the dark liquor." The defendant's orders were that Potter was the "bagman" and Vieira was the "gunman." The defendant told them to run when they were finished and he would pick them up down the street.

Vieira was wearing a black Boston Bruins sweatshirt and a mask, and Potter

---

[2] During cross-examination, Potter testified that he and Vieira were walking outside his house when they noticed the silver Chevy Impala parked nearby. According to Potter, defendant ordered him and Vieira to get into the car, pointed a gun at his face, and threatened to kill him and his mother if he did not follow orders.

wore a gray sweatshirt, a backpack, and a bandana covering his face. The two men exited the car and crossed the street towards Bella Vista Liquors. When they saw a man enter the store, they hesitated before entering. Once inside, Potter hopped over the counter and demanded money from the cashier while Vieira threatened a customer with the firearm. When the cashier refused to comply with Potter's demand, he jumped back over the counter. Vieira stole money from the customer and, on their way out of the store, Potter grabbed a bottle of vodka, not the dark liquor defendant had demanded.

The pair then ran back to Potter's house, where they immediately changed clothes. The defendant and DaSilva drove back to the Potter home and Potter and Vieira joined them. The defendant was angry that they had not stolen more money or any dark liquor. The defendant and DaSilva began arguing; they disagreed as to their next target. As a result, they switched seats and defendant drove. He proceeded to his residence on Kossuth Street, went inside, came back out, and gave Potter a pair of black Air Force 1 sneakers to replace the slippers he was wearing. He again threatened Potter, telling him he "better do a better job this time" and instructed them to rob the Silver Mart, which was located a short distance away. As the two walked toward the Silver Mart, Vieira "started getting cold feet" and the pair returned to the

car.[3]  The defendant again became angry.

A discussion about robbing another liquor store ensued.  The defendant drove[4] to Colonial Liquors and instructed Potter and Vieira to rob the store or he would kill them if they did not comply.  Having changed clothing earlier, Vieira was now wearing a red fleece jacket and Potter wore a gray sweater and a backpack.  Both wore bandanas over their faces.  The defendant dropped them in front of an apartment complex near the liquor store.  They walked to the liquor store and peered inside.  As they entered, Potter proceeded to grab numerous bottles of the preferred beverage, including Hennessey, Remy, and D'Ussé cognac.  He also took money from the cashier while Vieira held the firearm.  When they returned to the vehicle, defendant drove back to his house, where he divided up the money and liquor from the robberies.  The defendant was not satisfied.

All four men got back into the car, defendant drove to Main Street Liquors and, according to Potter, DaSilva went inside to "scope out the area" and defendant drove to a parking lot across the street.  They entered the store and Vieira held the silver handgun and yelled, "[O]pen up the register and give [them] all the cash."

_____

[3] During cross-examination, Potter testified that he and Vieira left the Silver Mart and ran back to defendant's residence on Kossuth Street.

[4] At one point, Potter testified that DaSilva, not defendant, drove to Colonial Liquors. Vieira and DaSilva, however, testified that defendant was the one who drove the group to Colonial Liquors.

- 8 -

Potter went behind the counter and collected money from two registers. As they left the store, Potter stuffed more bottles of dark liquor into the backpack. The men ran down the street, were picked up by defendant, who proceeded to a house on Weeden Street where he counted the money. He was pleased with the amount of money; and he divided the cash and liquor among the men. Potter and Vieira then left and walked back to Potter's house.[5]

According to Potter, the same gun was used in all three robberies, but its whereabouts after the robberies was unclear. Potter's grand jury testimony was introduced; it indicated that Vieira had thrown the gun under some bushes after the Bella Vista robbery. However, at trial Potter testified that he saw Vieira throw gloves and a mask in the bushes but not the gun. He assumed Vieira still had the gun when they returned to Potter's house after the crime spree ended. Vieira testified that he brought the gun back to Potter's house after the robberies, but at some point, he gave it back to defendant.

During initial interviews, Vieira, Potter, and DaSilva were reluctant to cooperate when asked about the robberies. Vieira initially denied any knowledge, but later testified that he did not want to "snitch" because he thought he was going

---

[5] At another point during trial, Potter testified that defendant drove him and Vieira back to his house in defendant's black BMW. Vieira testified that defendant gave them a ride back to Potter's house. DaSilva, however, testified that he drove Vieira and Potter back to the house while defendant stayed at the house on Weeden Street.

- 9 -

to get away with the crimes. Vieira eventually identified the participants, including defendant.

Potter testified that he initially lied to the police because he was "petrified" and "scared of snitching." When he was shown photographs of DaSilva and defendant, he denied knowing them. After he was allowed a phone call to his mother, who was crying, he was returned to an interview room and provided the police with an audio/video recorded statement. Nonetheless, Potter remained reluctant to tell the police the entire truth. He testified that eventually, after he entered into a cooperation agreement with the state, he made a full disclosure, including the involvement of Vieira, DaSilva, and defendant. This agreement was the subject of vigorous cross-examination at defendant's trial.

DaSilva, the third participant, admitted that he was untruthful at first and told the police that he and defendant had given Potter and Vieira a ride home but had no idea that they had committed any robberies. In the end, however, DaSilva provided the Pawtucket police with a statement in which, according to his testimony, he told the truth about what had actually occurred, including defendant's participation.[6]

---

[6] The record discloses that Vieira pleaded guilty to four counts of first-degree robbery, three counts of felony conspiracy, pleaded nolo contendere to one count of misdemeanor conspiracy, and was sentenced to fifteen years, five to serve, ten suspended, with probation, for each of the robbery counts, ten years, all suspended, with probation, for each of the felony conspiracy counts, and one year suspended, with probation, for the misdemeanor conspiracy count, all counts to run concurrently.

The defendant was subsequently arrested and charged with fifteen felony counts.[7] A seven-day jury trial commenced on November 5, 2019. At the conclusion of the state's case, defendant moved for a judgment of acquittal on all counts, which was denied. The defense then rested. The jury found defendant not guilty of all offenses related to the barbershop but guilty of the robberies of five individuals at the three liquor stores and conspiracy to rob those three liquor stores.

The defendant filed a motion for a new trial, which the trial justice denied. Thereafter, the trial justice sentenced defendant to twenty years to serve on each

---

Potter entered a plea of nolo contendere to three counts of second-degree robbery and three counts of conspiracy and was sentenced on all counts to ten years, all ten years suspended, with probation, all counts to run concurrently.

DaSilva pleaded guilty to two counts of conspiracy and was sentenced to ten years, three to serve, seven suspended on both counts, to run concurrently.

[7] Specifically, defendant was charged with the robbery of Rodas, Armand, Frink, and DeMacedo at the barbershop (counts one through four), conspiracy to commit the barbershop robbery (count five), a robbery (count six) and conspiracy to commit a robbery (count seven) in a downtown Pawtucket parking garage in the early morning hours of November 4, 2018, the robberies of Goncalves and Mourato at Bella Vista Liquors (counts eight and nine), conspiracy to commit the robbery of Bella Vista Liquors (count ten), the robberies of Bogolawski, Jr. and Bogolawski, Sr. at Colonial Liquors (counts eleven and twelve), conspiracy to commit the robbery of Colonial Liquors (count thirteen), the robbery of Mendes at Main Street Liquors (count fourteen), and conspiracy to commit the robbery of Main Street Liquors (count fifteen). In total, defendant was charged with ten counts of first-degree robbery in violation of G.L. 1956 § 11-39-1(a) and five counts of conspiracy to commit robbery in violation of G.L. 1956 § 11-1-6. During trial, the state dismissed counts six and seven. As a result, defendant was acquitted of four counts of first-degree robbery and one count of conspiracy but was convicted of five counts of first-degree robbery and three counts of conspiracy to rob.

- 11 -

count of first-degree robbery, to be served concurrently, and five years to serve on each count of conspiracy, also to be served concurrently with each other and with the robbery counts. The trial justice also determined defendant to be a habitual offender and, as a result, sentenced him to twenty-five years, twenty to serve, five suspended, with probation, to run consecutively to the robbery and conspiracy counts. This appeal followed.

On appeal, defendant asserts two claims of error. First, defendant claims that the trial justice erred by failing to exclude statements he made about firearms during a post-arrest interrogation by the police. Second, defendant claims that the trial justice erred in denying his motion for a new trial. We address each claim in turn.

**Standard of Review**

"It is well settled that we review a trial justice's decision admitting or excluding evidence under an abuse of discretion standard." *State v. Bozzo*, 223 A.3d 755, 765 (R.I. 2020) (quoting *State v. Clements*, 83 A.3d 553, 561 (R.I. 2014)). "Accordingly, we will reverse a trial justice's ruling on the admissibility of evidence only where it constitutes a clear abuse of discretion." *State v. Doyle*, 235 A.3d 482, 493 (R.I. 2020) (quoting *Clements*, 83 A.3d at 561). "In reviewing a trial justice's admission of Rule 404(b) evidence, this Court is disinclined to perceive an abuse of discretion so long as the record contains some grounds for supporting the trial justice's decision * * *." *State v. Peltier*, 116 A.3d 150, 154 (R.I. 2015) (quoting

*State v. Clay*, 79 A.3d 832, 838 (R.I. 2013)).

"[W]hen a trial justice considers whether the verdict is against the weight of the evidence, he or she sits as the legendary thirteenth juror; and, in light of the charge to the jury, must exercise his or her independent judgment in weighing the evidence and assessing the credibility of the witnesses." *State v. Covington*, 69 A.3d 855, 862 (R.I. 2013) (quoting *State v. Smith*, 39 A.3d 669, 673 (R.I. 2012)). "The task before the trial justice is to '(1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury.'" *State v. Garcia*, 140 A.3d 133, 145 (R.I. 2016) (quoting *State v. Gregson*, 113 A.3d 393, 398 (R.I. 2015)). "If, after conducting such a review, the trial justice reaches the same conclusion as the jury, the verdict should be affirmed and the motion for a new trial denied." *State v. Bojang*, 83 A.3d 526, 539 (R.I. 2014) (quoting *State v. Heredia*, 10 A.3d 443, 446 (R.I. 2010)). "Review of a trial justice's decision on a motion for a new trial based on the weight of the evidence is normally deferential, and the decision will be given great weight and not be disturbed 'unless the trial justice overlooked or misconceived material evidence or otherwise was clearly wrong.'" *Doyle*, 235 A.3d at 513 (quoting *State v. Lopez*, 129 A.3d 77, 83-84 (R.I. 2016)). "We employ this deferential standard of review because a trial justice, being present during all phases

of the trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses." *State v. Pona*, 66 A.3d 454, 476 (R.I. 2013) (quoting *State v. Paola*, 59 A.3d 99, 104 (R.I. 2013)).

## Analysis

### Defendant's Statements About Firearms

We begin by addressing defendant's claim that the trial justice erred by failing to exclude his statements regarding his involvement with firearms during a post-arrest interview with the police.[8] The defendant was interviewed on November 16, 2018, and made numerous statements regarding firearms in an attempt to exculpate himself from these crimes.[9] For example, defendant explained that he offered to purchase a handgun from Vieira, who was the gunman for each robbery:

> "Q: So he was offering to sell you a gun for 500 bucks?
>
> "[Defendant]: Yeah, he wanted seven. I told him . . .
>
> "Q: Oh, you said 700. Then . . .
>
> "[Defendant]: He said 700. I said 5."

According to defendant, around the time of the robberies, he had paid Vieira a

---

[8] There has been no challenge to the voluntariness of this interview and that issue is not before us.

[9] The defendant's statements during this police interview regarding his involvement in firearms transactions are numerous. However, many of defendant's statements as captured by the audio/video recording are inaudible. As a result, we provide only a brief synopsis of defendant's statements.

- 14 -

portion of the agreed-upon price and was planning to pay him the remaining sum and take possession of the firearm, but, he contended, the transaction was never completed:

> "Q: So did he give you the gun?
>
> "[Defendant]: No, I was supposed to get it, get it Friday * * *.
>
> "* * *
>
> "Q: All right. So you gave him 250 and he didn't give you the gun?
>
> "[Defendant]: I was supposed to have got it to him on Friday. * * *
>
> "* * *
>
> "[Defendant]: * * * I gave another 250, you know what I'm saying? Friday, I was gonna give him the other 250."[10]

The defendant told police that he was not in possession of the weapon:

> "Q: Where's the gun? Where's the gun at?
>
> "[Defendant]: I don't have it. I don't know. * * * I don't have no handgun. Tell . . . ask them."

---

[10] The defendant was interviewed on November 16, 2018, which was a Friday. Throughout his interview with police, defendant repeatedly states that he intended to complete the purchase of the firearm from Vieira on "Friday" but does not specify which Friday. The defendant explained during the interview that he had a discussion with Vieira about purchasing the firearm at "the end of last [weekend]" and during that conversation said he would have the rest of the money to purchase it "next Friday."

- 15 -

Although defendant denied having obtained a firearm from Vieira, which he characterized as a "hammer," he also volunteered that, some months earlier, he had purchased a different firearm and sold it for a profit:

> "[Defendant]: I don't have the hammer.  I don't have the gun.  I didn't * * * see no gun.  Like, * * * I'll show you a * * * hammer.  It's in my phone and it's not gun 40.  It's a * * * 380 FRO-, FROM MONTHS AGO and I got it, sold it.  Made a couple little extra bucks."

The defendant went on and explained:

> "[Defendant]: * * * I'm talking to [Vieira], this and that and, like, 'Yo, you . . .' I was like, 'Yo, what do you want for that hammer?'  He was like, '700.'  I was like, 'Can I do . . . I'll give you a nickel.' * * * I was really just trying to get all the bread together. * * * And I brought him money the next day so I COULD THEN have a deposit on it.  I supposed to get it Friday.  And that's it.  I mean, all I know about the hammer, it's supposed to be a 40.  You know what I'm saying?  AND LIKE I TOLD THEM, * * * only gun I ever had in my possession a few months ago was a 380 and I . . . it wasn't even really in my possession. * * * I made the sale.  I made my * * * $100.  You know what I mean?  I said, like, yo, I'm, I know I'm fucking myself doing the same shit * * *.  I know.  Like, he's telling me, I have the same . . . I don't have no hammer."

He did not disclose from whom he had purchased the firearm or to whom he sold it.

On the fifth day of trial, when the state sought to introduce the audio/video recording of the interview, the state informed the trial justice that, although some portions were to be excluded by agreement, the parties had not yet reached an agreement as to what portions would be admitted.  As a result, trial was adjourned

- 16 -

until the following day, with instruction to counsel to resolve the matter before then. However, the following day, the parties had still not reached an agreement. The defendant objected to the admission of his statements during the police interview referring to firearms transactions. He argued that his statements referencing firearms should be excluded as propensity evidence pursuant to Rule 404(b) of the Rhode Island Rules of Evidence.

The state argued that defendant's statements were relevant as to the issues of intent, opportunity, and identity. The state contended that defendant's statements about the gun used in the robberies, including his plan to buy it or sell it, along with his statement that he had previously bought and sold a gun a few months before the robberies established that he had the opportunity to obtain a firearm in advance of the robberies, and served to identify him as the person who provided the firearm, consistent with the testimony of Vieira and Potter. Thus, the state argued, the statements were not being offered as propensity evidence, but rather as evidence of defendant's intent, opportunity, and identity.

The trial justice noted that the transcript of the interview was "filled with and interspersed with [defendant] talking about buying and selling a gun or guns; a hammer, as he calls it." The trial justice explained that "these are statements from the defendant's own mouth," which the trial justice explained "cuts against him." He further explained that there was a dispute at trial as to whether the firearm used

during the robberies was discarded somewhere after the commission of those crimes. The trial justice noted that defendant's interview with the police was "full of denials, conversations, admissions about the defendant with a firearm" and showed that "[t]his man has access to guns, according to his own testimony." The statements made by defendant evinced that he "buys and sells them apparently, or tries to." As a result, the trial justice denied defendant's motion to exclude his statements made during the interview regarding firearms.

## Rule 404(b)

On appeal, defendant contends that the trial justice abused his discretion in admitting defendant's statements pursuant to Rule 404(b). According to defendant, his references to firearms during the police interrogation constituted impermissible propensity evidence because they "left the jury with the inescapable impression that he was someone who trafficked in firearms and the type of person who was likely to have carried out the liquor store robberies."[11] We are unpersuaded.

We begin by noting that defendant's statements are statements by a party-opponent, as the trial justice aptly recognized. A statement by a party-opponent is a

---

[11] To the extent defendant argues the statements should have been excluded under Rules 401 or 402, we note that defendant did not raise this argument below, and therefore, it has been waived. *See State v. Doyle*, 235 A.3d 482, 493 (R.I. 2020) ("[I]t is well settled that a litigant cannot raise an objection or advance a new theory on appeal if it was not raised before the trial court.") (quoting *Cusick v. Cusick*, 210 A.3d 1199, 1203 (R.I. 2019)).

statement which "is offered against a party" and "is the party's own statement, in either the party's individual or a representative capacity * * *." R.I. R. Evid. 801(d)(2)(A); *see also State v. Sivo*, 809 A.2d 481, 489 (R.I. 2002) (explaining that defendant's statement "was admissible under Rule 801(d)(2)(A) of the Rhode Island Rules of Evidence, providing that a party's own statement offered against him is not hearsay"). Here, the state offered defendant's own statements as evidence against him.

We also pause to note that this evidence amounts to statements against interest by the accused in an attempt to exculpate himself from the crime on trial. Rule 804(b)(3) of the Rhode Island Rules of Evidence provides that statements against interest are not excluded by the hearsay rule:

> "*Statement Against Interest*. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true."[12] R.I. R. Evid. 804(b)(3).

The defendant's statements to the police regarding his participation in a transaction for the purchase and sale of a gun in the past and his statements about his alleged

---

[12] Rule 804(b)(3) also requires that the "declarant is unavailable as a witness * * *." *State v. Bunnell*, 47 A.3d 220, 229 n.13 (R.I. 2012). The defendant in this case did not testify, as was his right.

- 19 -

agreement to purchase a firearm from Vieira—a transaction that he contends was never completed—qualify as statements against his interest, although made in an attempt to exculpate himself from the robberies, these statements are probative on the question of guilt and are against defendant's penal interest. *See id.*

Accordingly, we address defendant's contention that the trial justice abused his discretion in admitting his statements under Rule 404(b).[13]  "When performing [an] abuse of discretion analysis in the context of Rule 404(b), this Court first looks to the scope of allowable proof under the rule." *State v. Cavanaugh*, 158 A.3d 268, 279 (R.I. 2017) (quoting *Peltier*, 116 A.3d at 153).  In most instances, Rule 404(b) prohibits evidence of prior bad acts to prove defendant acted in conformity therewith. *See State v. Colon*, 198 A.3d 1249, 1254 (R.I. 2019) ("Rule 404(b) generally prohibits the use of evidence of prior bad acts, wrongs, or crimes to show the defendant's propensity to commit the crime with which he [or she] is currently charged.") (brackets omitted) (quoting *State v. Dubois*, 36 A.3d 191, 199 (R.I.

---

[13] Rule 404(b) provides:

> "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or to prove that defendant feared imminent bodily harm and that the fear was reasonable."

2012)). "[I]t is only when evidence of prior crimes, wrongs, or acts is offered to prove that the accused has a criminal disposition and, therefore, is more likely to have committed the crime for which he [or she] stands accused, that Rule 404(b) requires its exclusion." *Pona*, 66 A.3d at 466 (quoting *State v. Rodriguez*, 996 A.2d 145, 151 (R.I. 2010)).

The "rule does not 'require exclusion of otherwise legally probative evidence simply because such evidence might also suggest past criminal activity.'" *State v. Garcia*, 743 A.2d 1038, 1051 (R.I. 2000) (quoting *State v. Gordon*, 508 A.2d 1339, 1348 (R.I. 1986)). "We have long held that evidence of prior bad acts is admissible 'if such evidence has independent relevance in respect to the proof of an element material to the chain of proof of the crime in issue,'" *State v. Martinez*, 59 A.3d 73, 85 (R.I. 2013) (quoting *Garcia*, 743 A.2d at 1052), or "when the 'prior acts are interwoven or in instances when introduction is necessary for a trier of fact to hear a complete and, it is to be hoped, coherent story so as to make an accurate determination of guilt or innocence,'" *Peltier*, 116 A.3d at 154 (quoting *Clay*, 79 A.3d at 838). To this end, Rule 404(b) "permits the introduction of evidence of other conduct, including conduct of a criminal nature, for other purposes, such as to show a defendant's 'motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident.'" *Doyle*, 235 A.3d at 496 (brackets omitted) (quoting R.I. R. Evid. 404(b)).

"We recognize, of course, that '[t]he line between Rule 404(b) evidence presented for the impermissible purpose of demonstrating propensity and Rule 404(b) evidence presented for one of the specific non-propensity exceptions is both a fine one to draw and an even more difficult one for judges and juries to follow.'" *Pona*, 66 A.3d at 466 (quoting *Rodriguez*, 996 A.2d at 150). "In reviewing a trial justice's admission of Rule 404(b) evidence, this Court is disinclined to perceive an abuse of discretion so long as the record contains some grounds for supporting the trial justice's decision * * *." *Cavanaugh*, 158 A.3d at 279 (quoting *Clay*, 79 A.3d at 838).

We perceive no abuse of discretion on the part of the trial justice in admitting defendant's statements concerning the two firearms transactions pursuant to Rule 404(b). The trial justice concluded that the evidence was relevant to defendant's access to firearms. We agree with the trial justice's conclusion that the evidence was admissible on nonpropensity grounds; it was relevant to defendant's opportunity to obtain and provide a firearm for the robberies, because it established that he had contact with Vieira to purchase a firearm.

Evidence was presented at trial that it was defendant who supplied Vieira with a handgun to use during the multiple robberies. The defendant, however, in his statements to police, denied having a handgun and implied that Viera supplied the weapon. Thus, defendant's statements about the two firearms transactions were

relevant as to whether defendant supplied Vieira with the gun used in the robberies. *See State v. Brown*, 42 A.3d 1239, 1244 (R.I. 2012) ("Rule 401 of the Rhode Island Rules of Evidence broadly defines relevant evidence as 'evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'") (quoting R.I. R. Evid. 401). As a result, his statements about firearms were probative of defendant's opportunity, intent, preparation, or plan to supply a weapon for the robberies and, therefore, were properly admitted into evidence for nonpropensity purposes. *See Doyle*, 235 A.3d at 496.

The defendant argues that the facts at hand are akin to those in *State v. Brash*, 512 A.2d 1375 (R.I. 1986), in which this Court held that the admission, pursuant to Rule 404(b), of evidence that the defendants had access to weapons was improper. *Brash*, 512 A.2d at 1383. In *Brash*, the defendants were charged with conspiracy to commit murder, among other things. *Id.* at 1376. During their trial, evidence was introduced, over the defendants' objection, that a farmer had made his large supply of weapons available to the defendants for target practice. *Id.* at 1381. This cache included fifteen weapons, eight of which were made full exhibits at trial. *Id.* This Court concluded that this evidence amounted to reversible error because "any preparation for the crime took place miles away from [the] farm, which was also not the source of any of the weapons used [in the murder]." *Id.* at 1383. We explained

that "the evidence was simply insufficient to lay an adequate foundation linking defendants' activities with [the] murder, and any adverse inferences drawn from those activities were impermissible in this murder trial." *Id.*

Unlike in *Brash*, where the relevance and materiality of the testimony about the arsenal of firearms introduced into evidence "rested on shaky ground," *Brash*, 512 A.2d at 1383, in this case, evidence that defendant had access to a firearm from Vieira, a coconspirator, was highly probative of defendant's involvement in the conspiracy to commit the robberies.

The facts of this case are more akin to those in this Court's more recent case, *State v. Rios*, 996 A.2d 635 (R.I. 2010). In *Rios*, the defendant was charged, *inter alia*, with murder and commission of a crime of violence with a firearm. *Rios*, 996 A.2d at 637. Prior to trial, he filed a motion *in limine* seeking to preclude two witnesses from testifying "that [d]efendant was observed in possession of a handgun" prior to the murder. *Id.* According to the defendant, "such testimony constituted evidence of prior bad acts that was inadmissible under Rule 404(b) * * *." *Id.* The trial justice denied his motion and the defendant was convicted on all charges. *Id.* at 637, 638.

On appeal, this Court concluded that the trial justice did not err because the state "sought to elicit testimony indicating that defendant had access to a handgun." *Rios*, 996 A.2d at 639-40. We noted, that "possession of * * * firearms and

- 24 -

ammunition [may be] admissible under [Rule 404(b)] on the independent ground that it tended to show [the defendant] had the opportunity to commit the * * * robbery, since he had access to weapons similar to those used to commit it * * *." *Id.* (quoting *United States v. Woods*, 613 F.2d 629, 636 (6th Cir. 1980)). Under the facts in *Rios*, the Court concluded that "[e]vidence that defendant frequently carried a handgun, if true, was relevant to demonstrate that he had access to a weapon and had the opportunity to murder [the decedent]." *Id.*

The defendant contends that unlike *Rios*, he stated that he had previously purchased and sold a firearm months before the robberies occurred and argues that there is no evidence that the firearm was still in his possession. Specifically, defendant argues that his statements about buying and selling "an unrelated gun" months before the robberies "were highly prejudicial and had nothing at all to do with the liquor store robberies for which he was on trial." The defendant also asserts that, unlike *Rios*, no evidence was presented that he was known to carry a handgun. We disagree. The defendant's own statements about his involvement in the buying and selling of firearms establish that defendant had access to firearms and was familiar with various types of firearms.

Furthermore, in this case, unlike in *Brash*, defendant's agreement to purchase a firearm from Vieira was "related so closely in both time and place to the charged acts * * * committed by the defendant and were so intricately interwoven with the

charged acts, their admission was proper." *Peltier*, 116 A.3d at 155 (quoting *State v. Morey*, 722 A.2d 1185, 1189 (R.I. 1999)); *see Brash*, 512 A.2d at 1383. The defendant explained during his interview with the police that he had planned to purchase a firearm from Vieira on "Friday." Defendant admitted to being in the vicinity of the liquor stores on the day of the robberies, and that he and DaSilva had given Potter and Vieira a ride home from Harrison Street in Pawtucket. As in *Peltier*, defendant's confession in the case at bar, that he had entered into an agreement with Vieira to purchase a firearm, was so closely related "in both time and place" that its admission was proper. *See Peltier*, 116 A.3d at 155.

In sum, defendant's statements about firearms were probative of his opportunity, intent, preparation, or plan to supply a weapon for the robberies and conspire to commit the robberies. We see no abuse of discretion in admitting the statements into evidence.

### Rule 403

The defendant also asserts that the trial justice failed to undertake a Rule 403 balancing test prior to admitting defendant's statements and that the statements should have been excluded under Rule 403 because the prejudicial effect of those statements far outweighed its probative value.[14] We reject this contention.

---

[14] The defendant also argues that the trial justice erred by failing to give a cautionary instruction about the limited purpose for which his statements regarding firearms were being admitted. We conclude that this argument is not preserved for our

"[E]vidence that may otherwise be admissible under Rule 404(b) is still subject to the Rule 403 [of the Rhode Island Rules of Evidence] balancing test, which excludes otherwise relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury * * *." *Peltier*, 116 A.3d at 154 (quoting *Clay*, 79 A.3d at 838). "Rule 403 * * * 'cuts across the rules of evidence and is always a consideration in a trial justice's ruling on the admissibility of Rule 404(b) evidence * * *.'" *Pona*, 66 A.3d at 466 (quoting *State v. Gaspar*, 982 A.2d 140, 148 (R.I. 2009)). "[T]he trial justice 'must balance the relevance of the evidence against its remoteness and the potential for improper prejudicial impact.'" *State v. Buchanan*, 81 A.3d 1119, 1125 (R.I.

review, as defendant did not request such a limiting instruction during trial and, furthermore, failed to object to the jury instructions.

We pause to note, however, that although the trial justice was not required to issue a cautionary instruction because the present case does not deal with sexual assault, *see State v. Garcia*, 743 A.2d 1038, 1052-53 n.10 (R.I. 2000), the better practice in cases such as this—where evidence is admitted pursuant to Rule 404(b) for a legitimate purpose such as to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident—is for the trial justice to provide a limiting instruction. *See id.* at 1052 ("In cases like the one at bar, in which the evidence in question can be used for multiple purposes, some of which are permissible and others of which are not, the trial justice should issue specific instructions to the jury explaining 'the limited purpose [or purposes] for which the jury may consider it.'") (quoting *State v. Gallagher*, 654 A.2d 1206, 1210 (R.I. 1995)); *see also State v. Rodriguez*, 996 A.2d 145, 154 n.14 (R.I. 2010) ("[T]his Court has long held that, 'even when such evidence is admitted under an exception to Rule 404(b), a trial justice should receive it with great caution and should specifically instruct the jury regarding its limited purpose.'") (quoting *State v. McVeigh*, 660 A.2d 269, 272 (R.I. 1995)) (emphasis omitted).

- 27 -

2014) (quoting *Dubois*, 36 A.3d at 200). "However, 'a trial justice's discretion to exclude evidence under Rule 403 must be used sparingly. * * * It is only when evidence is marginally relevant and enormously prejudicial that a trial justice must exclude it.'" *Pona*, 66 A.3d at 466 (quoting *Smith*, 39 A.3d at 675).

During trial, defendant objected to the admission of his statements on the basis that the evidence was "highly prejudicial" and the prejudice "outweigh[ed] any probative value" the evidence might have. Thus, defendant argued, his statements about buying and selling firearms should be excluded under Rule 403. The state responded that, although the evidence was "obviously prejudicial, as all evidence against a defendant is[,]" it was also "extremely probative" and therefore should not be excluded under Rule 403. The trial justice concluded, over defendant's objection, that defendant's own statements offered against him were admissible.

Our careful review of the record satisfies the Court that the relevance of defendant's statements was not substantially outweighed by potential prejudice. *See State v. Patel*, 949 A.2d 401, 413-14 (R.I. 2008) (concluding that, although the trial justice "failed to properly set forth her reasoning and the factors that weighed in favor of [the evidence's] admissibility" in conducting a Rule 403 analysis, this Court was "satisfied that the issue of the [evidence's] relevance, as balanced against the risk of unfair prejudice, [was] apparent on the record"). The defendant's exculpatory statements may have been prejudicial but were not unfairly prejudicial "because

- 28 -

most evidence offered at trial is inherently prejudicial * * * [o]nly unfairly prejudicial evidence is barred under Rule 403." *State v. Perry*, 182 A.3d 558, 572 (R.I. 2018) (emphasis and brackets omitted) (quoting *State v. Cook*, 45 A.3d 1272, 1280 (R.I. 2012)). In the present case, we are unable to conclude that the prejudice arising from these highly relevant statements substantially outweighed their probative value.

In reaching his conclusion, the trial justice explained that defendant's interview with the police was "filled with and interspersed with [defendant] talking about buying and selling a gun or guns * * *." He further explained that there was a dispute at trial as to whether the firearm used during the robberies was discarded somewhere after the commission of those crimes. The trial justice noted that defendant's interview with the police was "full of denials, conversations, admissions about the defendant with a firearm" and showed that "[t]his man has access to guns * * *." The statements made by defendant evinced that defendant "buys and sells them apparently, or tries to." Thus, defendant's statements about his own involvement and that of Viera, a coconspirator and the gunman, in deals to buy and sell firearms were highly probative and directly relevant to the crimes on trial. Therefore, this evidence had a tendency to make it more probable that defendant had the opportunity, intent, preparation, and plan to provide a gun for use in the robberies. *See Brown*, 42 A.3d at 1244.

We therefore reject defendant's contention that the trial justice failed to preclude the admission of defendant's statements about firearms under Rule 403.

**Motion for a New Trial**

We next address defendant's claim that the trial justice erred in denying his motion for a new trial. Specifically, defendant contends that the verdict was against the weight of the evidence. According to defendant, Potter, Vieira, and DaSilva had motives and opportunities to tailor their testimony, which the trial justice overlooked. The self-serving testimony of these three witnesses, defendant asserts, was the only evidence introduced at trial linking defendant to the robberies. The defendant argues that the trial justice overlooked inconsistencies between Potter's grand jury and trial testimony and misconceived the corroborative value of the physical evidence admitted during trial because, he argues, none of it tied defendant to the robberies. We disagree.

During a hearing on the motion for a new trial, defendant stressed that the only evidence implicating him in this crime spree was the testimony of his three purported accomplices. According to defendant, "[t]here was nothing else to support the[] verdicts of guilty." The defendant argued that the uncorroborated testimony of the accomplices was insufficient to support his convictions, relying on *Watson v. State*, 117 A.2d 549 (Md. 1955), which has been abrogated by *State v. Jones*, 216

A.3d 907 (Md. 2019).[15]  The defendant asserted that Potter, Vieira, and DaSilva all had incentives to lie.

The state responded that the jurors were the sole arbiters of credibility of the witnesses and were provided with a credibility instruction which informed them that they could accept or reject some or all of a witness's testimony.  The state cited *State v. DeMasi*, 413 A.2d 99 (R.I. 1980), which provides that "the testimony of an accomplice, standing alone, is sufficient to sustain a conviction." *DeMasi*, 413 A.2d at 100.  The state also disagreed with defendant's contention that the only evidence implicating defendant was the testimony of Potter, Vieira, and DaSilva, noting that defendant's own statements during his interview with the police were admitted into evidence.  According to the state, defendant's statements "put him[] at the scene of the third of the three liquor store robberies in the car."  The state also emphasized that surveillance footage from the liquor stores was introduced into evidence and this footage corroborated the testimony of Potter, Vieira, and DaSilva.

The trial justice denied the motion for a new trial, explaining that he was "comfortable with what this jury decided to do here."  He noted that the jury had acquitted defendant of the charges associated with the barbershop robbery, evidence

---

[15] In *State v. Jones*, 216 A.3d 907 (Md. 2019), the Court of Appeals of Maryland held that when an accomplice testifies as to uncorroborated facts, "the issue will be the weight of the evidence, not its legal sufficiency and trial courts need only give a cautionary instruction." *Jones*, 216 A.3d at 919.

of which the trial justice did not "think was as substantial" as the evidence presented for "the liquor store events." The acquittal, the trial justice emphasized, did not diminish the evidence against defendant with regard to the liquor store robberies. The trial justice determined that the testimony of defendant's three accomplices was corroborated by other evidence admitted at trial, including defendant's own self-serving statements.

The trial justice acknowledged that, although the accomplice witnesses, "younger than the defendant on trial, arrived on the witness stand with some baggage, and some skeptics would opine that they had an incentive that their testimony be deemed acceptable[,]" he noted that "their warts and their wrinkles were fully exposed" during trial as "their testimony was severely tested upon cross-examination * * *." The trial justice explained that, despite thorough cross-examination, "the jury examined that testimony and they decided to accept it" and "the jury had every right and reason to accept the testimony of the three individuals" because "[c]redibility decisions are quintessentially within the exclusive province of the jury * * *." The trial justice concluded that the jury had "made the right decision, and that there was ample evidence to support their verdicts beyond a reasonable doubt."

After our thorough review of the record, we reject defendant's claim that the trial justice overlooked or misconceived material evidence. Contrary to defendant's

assertion, the trial justice did not overlook the fact that Potter, Vieira, and DaSilva had "an overwhelming incentive to match their testimony to the state's theory of the case." Rather, the trial justice expressly acknowledged that the three accomplice witnesses had an incentive to falsify their testimony, but noted that credibility determinations were within the exclusive province of the jury. *See State v. Webber*, 716 A.2d 738, 742 (R.I. 1998) ("The determination of the truthfulness or credibility of a witness lies within the exclusive province of the jury.") (quoting *State v. Haslam*, 663 A.2d 902, 905 (R.I. 1995)). We are also hard-pressed to conclude that the trial justice overlooked inconsistencies in any of the witnesses' testimony. The trial justice explained that there were "warts and * * * wrinkles" in their testimony that were "fully exposed" on cross-examination. To the extent defendant disagrees with the trial justice's credibility determinations, we reiterate that such disagreement "is not a sufficient basis to warrant the granting of a motion for new trial." *Pona*, 66 A.3d at 476 (quoting *Paola*, 59 A.3d at 104).

Accordingly, we are of the opinion that the trial justice did not overlook or misconceive material evidence. *See Doyle*, 235 A.3d at 513. The trial justice aptly complied with the procedure relative to a motion for a new trial, conducted a thorough review of the credibility of the witnesses and the weight of the evidence to support the verdict, and articulated adequate reasons for denying the motion. The trial justice did not err by denying the defendant's motion for a new trial.

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The papers in this case may be returned to the Superior Court.

# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE

Licht Judicial Complex
250 Benefit Street
Providence, RI  02903



## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Tony Reverdes. |
| **Case Number** | No. 2021-218-C.A. (P1/19-247B) |
| **Date Opinion Filed** | June 20, 2023 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Robert D. Krause |
| **Attorney(s) on Appeal** | For State: <br><br> Mariana Ormonde <br> Department of Attorney General <br> For Defendant: <br><br> Michael G. Ewart <br> Rhode Island Public Defender |